**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

)
)
)
)

Case No. _____26-3233-JWL_____

(To be assigned by Clerk)

BRIAN LACAMERA,

    Petitioner,

)
)
)

v.

)
)

STATE OF KANSAS,

    Respondent.

)
)

---

## VERIFICATION AND UNSWORN DECLARATION

---

I, Brian LaCamera, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that I am the self-represented Petitioner in the above-captioned emergency action. I have read the foregoing Omnibus Emergency Motion for an Immediate Stay and Habeas Petition and the factual assertions contained therein.

I certify that all stated facts—including my background as a 100% disabled combat veteran with absolutely zero prior criminal history, the six-man cell extraction unit executing the forced buccal swab DNA collection, the public press reports exposing the Washington County Sheriff structural scandals, the state-sponsored blacklisting and customer loss 3+ hours away, the un-gated Riley County reality contradicting the facility's online security layout, the September 30 Bondsman's Affidavit, the judicial suppression of my plea withdrawal and identity theft motions, the attorney perjury under oath regarding discovery, the forged signatures on dismissals, the fake court dates, the June 6 recalled warrant with the wrong address error, the June 10 arrest, the 36-hour bail lockout, the July armed kick-in, the June 11 back-dated paper stamps, the refuting fax and video timestamps, Prosecutor Hiltgen's knowledge of the lies, Detective Parker's advance warrant tracking, the illegal notary signatures, and the physical injuries documented by Clay Center EMS—are entirely true, accurate, and correct to the best of my personal knowledge.

Executed on this 13th day of July, 2026.

or in trouble with the law a single time in his entire life, maintaining an absolutely unblemished criminal record while operating a compliant commercial enterprise.

The fact that a disabled veteran with zero prior criminal history was suddenly subjected to armed residential entries, a 9-day extrajudicial hold, physical battery, and forced jail-cell extractions reveals that the Respondents did not engage in neutral law enforcement, but launched a highly calculated, malicious, and retaliatory campaign designed to destroy his livelihood and shield local officials from civil exposure.

**SECTION I: FORCED PRETRIAL DNA EXTRACTION UNDER THE DURESS AND COERCION OF A SIX-MAN TACTICAL EXTRACTION CELL**

The multi-county law enforcement apparatus executed a severe violation of the Fourth and Fourteenth Amendments by deploying a coordinated six-man extraction cell to execute a forced, non-consensual biological DNA collection inside a closed jail cell. While holding the Petitioner trapped within an isolated holding block, one (1) jail supervisor, four (4) sheriffs, and the out-of-county detective physically cornered the Petitioner inside his cell. This six-man tactical element utilized overwhelming numbers, raw physical duress, overt threats of permanent maximum-security solitary confinement, and aggressive psychological bullying to strip the Petitioner of his bodily integrity.

The cell supervisor and executing officers explicitly threatened the Petitioner—falsely declaring that if he did not submit to a buccal mouth swab, they would throw him into total isolation indefinitely, hit him with a wall of new felony charges, and launch continuous armed raids against his family home. This forced extraction was conducted completely under duress, utilizing an uncataloged, facially dead, and expired October 7, 2025 search warrant that had already bypassed its strict 96-hour statutory execution window under K.S.A. § 22-2502(c).

To break the Petitioner's resistance during this containment, the six-man extraction team engaged in active psychological bullying—openly mocking his status as a 100% disabled combat veteran, telling him he "needed mental help" when he demanded to see a valid domestic warrant layout, and declaring that his constitutional protections did not exist inside their facility. The state actors deliberately leveraged this forced profile to retroactively patch over an empty investigative file, utilizing a back-dated notary stamp on January 20, 2026, to serialize a dead 2025 writ under a fake 2026 case tracking number (RL2026MR000018). Forcing a bodily intrusion through a six-man show of force and explicit psychological terror to validate an expired warrant crosses the boundary into outrageous government conduct, rendering the entire prosecution fruit of the poisonous tree and demanding an immediate federal stay.

## SECTION II: STATE-SPONSORED REPUTATIONAL DESTRUCTION, CONSTITUTIONAL STIGMA-PLUS BLACKLISTING, AND ISOLATION OF MINOR CHILDREN

The Respondents have intentionally weaponized their lawless, bad-faith prosecutions to execute a systematic, top-down destruction of the Petitioner's family, livelihood, and community standing, constituting a flagrant violation of the Fourteenth Amendment Liberty Interest under the federal "Stigma-Plus" Doctrine. Local sheriffs, deputies, and prosecutors have deliberately disseminated false, highly defamatory criminal labels throughout a tight-knit rural community—publicly branding a 100% disabled combat veteran as a "thief" and a "drug dealer" to protect an internal judicial restitution ring.

The real-world implementation of this state-sponsored defamation has entirely liquidated the Petitioner's family infrastructure. The local community has completely turned on the household. The Petitioner's minor daughters have been cruelly cast out and socially isolated—banned from neighborhood birthday parties, shunned by peers, and left terrified to step outside due to the armed raids and defamatory labels manufactured by local law enforcement.

Furthermore, this extrajudicial campaign has completely destroyed the Petitioner's commercial livelihood. The Petitioner's mobile scrap business has been entirely paralyzed and blacklisted. The Petitioner holds active, undeniable text message proof from commercial clients and individuals located over three (3) hours away, explicitly stating that they refuse to do business with him solely because of the criminal cloud and fraudulent database tracking entries generated by these counties.

By freezing his federal banking capability, executing a vehicle repossession, and initiating a fraudulent foreclosure on his family home while simultaneously using restrictive, localized probation parameters to block him from physically operating his scrap route or traveling out-of-state to bid on federal SAM.gov contracts, the Respondents have effectively locked the Petitioner from working and continue to do so. This calculated economic starvation of a household constitutes an ongoing, irreparable constitutional injury that cannot be remedied by post-trial damages, demanding an immediate emergency stay of all state supervisory power.

## SECTION III: THE RILEY COUNTY FRAUDULENT CRIME SCENE PREMISE AND DIGITAL TEXT LOG REPRESENTATION

The Riley County Sheriff's Office and Detective Wesley Ulmer intentionally fabricated the physical nature of the crime scene to mislead the court and manufacture probable cause where none existed. In his sworn affidavit, Detective Ulmer built a narrative implying a secure, monitored environment to make a transient cigarette butt match appear airtight. Furthermore, the storage facility's official online corporate layout explicitly advertises to the public that the property is fully fenced-in and secured by a 24/7 security camera array.

In physical reality, this layout is a total fiction designed to distort the legal requirements of proximity and intent. The facility features zero perimeter gates, zero fencing blocks, and wide-open public access immediately adjacent to a high-traffic commercial tobacco shop frequented by the Petitioner. Any individual walking down the street or utilizing the open driveway could have discarded the item, which then naturally moved onto the property via wind or foot traffic. Despite the facility's prominent public documentation claiming active camera coverage, the Riley County Sheriff's Office actively refused to secure the DVR server files. They intentionally permitted the video tracking log to automatically purge under standard cycles because the footage would have exposed the open, un-gated nature of the pavement, shown the true source of the debris, and conclusively established the Petitioner was never present at the scene. Suppressed video that completely refutes a manufactured police narrative constitutes a flagrant violation of Brady v. Maryland. Naming a citizen in a burglary complaint based on a circumstantial footprint in a wide-open public turnaround—while hiding behind a fake online layout—is a bad-faith enforcement track.

## SECTION IV: THE SEPTEMBER 30 BONDSMAN'S AFFIDAVIT EXPOSING THE THEFT OF LIBERTY AND DATABASE METADATA FRAUD

The absolute falsification of public court logs and the hidden nature of the state's prosecution is permanently pinned to the record by an independent corporate ledger live on the court portal. On September 30, 2025, the Defendant's professional bondsman, Shane Schmidt, electronically uploaded a formal Bondsman's Affidavit and Alibi Alerter File directly into the state database track. In this sworn document, the bondsman certified under penalty of perjury that the Defendant was already physically locked down, incapacitated, and securely caged inside a Washington County jail cell.

This independent filing completely destroys the state's master timeline. The Leavenworth Presentence Investigation Face Sheet and the Sheriff's Return officially certify to the state of Kansas that the Defendant's arrest and custody window did not even "begin" until October 2, 2025—amounting to a four-day tracking entry. It is a physical, logical, and mathematical impossibility for a professional bond agent to execute and file a real-time custody surrender index in the system on September 30th if the citizen was not even in the custody of the state until October 2nd.

This corporate ledger serves as irrefutable proof that the Washington and Leavenworth County Sheriff's Offices operated a "ghost transport" loop. They held a 100% disabled veteran entirely off the books, naked in an isolation cell, for a nine (9) day extrajudicial hold without ever logging his name on public intake monitors or presenting him to a magistrate judge under K.S.A. § 22-2901. They manually manufactured the October 2nd timeline after the fact to retroactively cleanse the record and prevent state database audits from triggering an automatic systemic dismissal for extreme out-of-bounds detention.

## SECTION V: STRUCTURAL SUPPRESSION OF PLEA WITHDRAWAL AND IDENTITY THEFT EVIDENCE BY THE JUDICIARY

The Leavenworth County District Court executed a total subversion of the adversarial system by intentionally falsifying the record to deny the Petitioner's absolute right to challenge a fraudulent conviction. The Petitioner formally filed a Motion to Deny Withdrawal of Defense Counsel and to Withdraw Coerced Plea, supported by exhaustive physical exhibits documenting a multi-jurisdictional identity theft matrix and an active Federal Trade Commission (FTC) Identity Theft Report (No. 192168260). Despite these clear, live files sitting on the electronic docket, the presiding judge summarily assigned a brand-new panel attorney behind the Petitioner's back and explicitly stated on the record that the Petitioner "never said anything about the attorneys" and held zero grounds for relief.

To protect this false narrative, the judge and the former court-appointed lawyers actively engaged in a coordinated act of perjury and structural fraud during open court. Multiple former panel attorneys took the witness stand and swore under oath that they had physically produced and reviewed all state discovery and evidence with the Petitioner prior to the plea track. In truth, not a single page of evidence or police documentation was ever shown to the Petitioner. This coordinated perjury was executed to manufacture a false paper trail of competent counsel, preventing the Petitioner from establishing the manifest injustice required to withdraw his plea.

The Petitioner's final court-appointed attorney held full, real-time knowledge of this deception —backed by exhaustive, black-and-white email correspondence explicitly alerting him to the identity theft records, the unnumbered search writs, and the timeline forgeries. Despite possessing this irrefutable proof, the final attorney chose to stand in absolute, complicit silence during the state court hearing—allowing the prosecutors to lie, allowing former counsel to commit perjury, and allowing a conflicted judge to manually enforce a $4,413.00 fraudulent restitution order straight to his lifelong personal associate, Benjamin Dale Phillips II, while telling the Petitioner he "needed mental help" to silence his voice on the record.

## SECTION VI: FORGED DEFENSE SIGNATURES AND FABRICATED DISMISSAL ENTRIES AT PHANTOM HEARINGS

The state court infrastructure completely collapsed into a lawless operation by manufacturing entirely fictional court proceedings to execute unconstitutional summary dismissals. The public-facing automated database contains formal Journal Entries and Dismissal Orders tracking specific court dates that never physically happened, where no courtroom was ever opened, and where the Petitioner was never present. During these phantom court dates, the prosecution and the court clerk generated formal entries asserting that the Petitioner's critical, active constitutional challenges were voluntarily

dismissed. To execute this fraud, court-appointed panel defense counsel forged their signatures onto formal dismissal orders without the Petitioner's knowledge, presence, or consent.

These forged attorney signatures were deployed exclusively to secretly withdraw and kill the Petitioner's active, pending Motions to Disqualify the Judge, Motions to Reinstate Bond, and Motions for Immediate Release. By manufacturing fake hearings to let an attorney sign away a client's liberty behind his back, the Respondents stripped the Petitioner of his absolute due process rights to shield a conflicted judiciary and preserve an illegal detention.

## SECTION VII: THE RECALLED WARRANT EXECUTION AND 36-HOUR BAIL LOCKOUT FRAUD WITH FACIAL ADDRESS DEFECT

The physical enforcement track against the Defendant began with an armed home invasion executed under a warrant that did not legally exist and was facially invalid. On June 6th, a judicial officer signed an arrest warrant, but officially and legally recalled that warrant that exact same day, logging the recall entry directly into the electronic court portal. Furthermore, the underpinning Leavenworth warrant track contained a fatal geographical defect, explicitly authorizing enforcement actions exclusively at "606 N. Main St."

Despite holding full administrative knowledge that the warrant was legally dead and targeted a completely different municipal address, Washington County deputies—acting under the direct command of the Head Sheriff—marched onto the Petitioner's property at 606 S. Main St. on June 10th and executed an unlawful arrest without holding any physical warrant in their possession.

The Defendant was arrested on this recalled, wrong-address instrument and held in absolute, extrajudicial custody for thirty-six (36) consecutive hours, during which he was explicitly denied his constitutional right to post bail. This 36-hour lockout was intentionally executed to incapacitate the Defendant, allowing court and jail personnel to manually stamp and upload brand-new, post-dated charging paperwork on June 11th. To retroactively cover up this bad-faith action, the arresting deputies willfully falsified the sworn return of service—fabricating an execution timestamp that is completely destroyed by independent fax timestamps and the Defendant's home security video footage, proving that the officers did not possess a valid warrant and deliberately falsified the actual time of arrest.

## SECTION VIII: THE ARMED JULY RESIDENTIAL INVASION AND GARAGE DOOR BREACH

The ongoing pattern of severe Fourth Amendment violations escalated dramatically the following month. In July, Washington County deputies—acting under the direct command of the Head Sheriff—returned to the Petitioner's real residence at 606 S. Main St. with weapons drawn. In direct defiance of standard constitutional constraints and matching the wrong-address execution pattern, the deputies launched an aggressive, tactical entry, forcefully kicking in and breaching the residential back

doors to conduct an armed sweep of the property. This violent residential breach left the home physically damaged, with the back doors remaining broken as a direct result of the raid. The July armed breach was executed completely outside the boundaries of due process, utilizing out-of-county tracking mechanisms to terrorize the household without a valid domestic search warrant signed by a Washington County judicial officer.

## SECTION IX: PROSECUTOR HILTGEN'S ACTUAL KNOWLEDGE, COMPLAINT MANIPULATION, AND VIDEO EVIDENCE BIAS

The absolute bad faith and malicious intent of Washington County Attorney Elizabeth B. Hiltgen is permanently established by her discovery production and complaint manipulation under Case No. WS-2026-CR-000002. Prosecutor Hiltgen knowingly initiated a felony obstruction track based entirely on an out-of-county Riley County search warrant that was a facial nullity—completely lacking an official court warrant number, stripped of any court clerk file stamps, and signed by an unverified person whose judicial authority was never authenticated on the record. To sustain this invalid action, Prosecutor Hiltgen packed the charging instrument with a panel of state witnesses who possessed zero physical presence at the scene and zero personal knowledge of the interaction.

Furthermore, prior to finalizing these charges, Prosecutor Hiltgen reviewed the front-porch body camera footage generated by her own executing deputies. This video recording permanently documents the Defendant standing openly on his threshold, explicitly alerting officers that the Riley County database held zero record of the warrant, and directly requesting that the Head Sheriff be brought to the scene to audit the defective paperwork. The video records the deputies flatly denying the request, declaring, "No, he doesn't have time to deal with this," before launching a physical, warrantless breach. Prosecutor Hiltgen's decision to proceed with a felony prosecution—and her subsequent attempt to retroactively amend the facially invalid future-dated timeline—proves she held actual knowledge that the underlying police records were fabricated, stripping her office of absolute immunity and demanding an immediate federal stay.

## SECTION X: DETECTIVE PARKER'S ADVANCE KNOWLEDGE, SWORN PERJURY, AND VIDEO IMPEACHMENT

The multi-county conspiracy is exposed by Detective Dustin Parker's explicit, advance knowledge of an unissued warrant. In his own signed, sworn statements, Detective Parker documents and references a Washington County arrest warrant three (3) full days before that warrant was ever legally signed, issued, or logged into the electronic court portal by a judicial officer. This advance knowledge proves that the warrant was not generated based on independent probable cause, but was pre-manufactured as a target-tracking tool.

Furthermore, Detective Parker committed overt perjury on the official return by falsely asserting the Defendant "barricaded inside the residence and refused to comply." This statement is flatly and completely disproven by the Defendant's private home security video, as well as the body camera footage of the very local Washington County deputies who stood directly beside him on the porch. All video tracks confirm that the Defendant never barricaded himself, but stood openly face-to-face with the unknown officers to challenge a facially dead, un-numbered writ.

### SECTION XI: PHYSICAL INJURY AND MEDICAL CORROBORATION BY CLAY CENTER EMS

The physical implementation of this conspiracy involved severe, documentable excessive force. During one of the seven (7) separate warrantless home invasions executed at a completely incorrect municipal address (606 N. Main St. instead of the Petitioner's actual home at 606 S. Main St.), the Head Sheriff of Washington County personally clamped metal handcuffs onto the Petitioner's wrists. The Head Sheriff tightened and locked the metal mechanisms with malicious force, deliberately breaking the skin and inflicting severe, deep lacerations. The trauma was so severe it required emergency medical intervention on-site, as formally documented within the records of the Clay Center EMS response unit.

### SECTION XII: EXTORTION AND EX PARTE CONSPIRACY BY APPOINTED COUNSEL

The Petitioner has been subjected to a total collapse of the adversarial system. Petitioner holds an ironclad audio recording of court-appointed defense counsel Greg Robinson explicitly stating that he refused to file the Petitioner's constitutional motions because the Petitioner had not paid a $100 public defender application fee, openly declaring that indigent clients deserve less effort. Robinson explicitly admitted to entering the private chambers of Judge Kuckelman immediately following court sessions to execute unauthorized, ex parte communications regarding the Petitioner's evidence. Robinson, Judge Kuckelman, and the complaining witness, Benjamin Dale Phillips II, maintain lifelong personal and financial relationships, enabling the court to bypass the Confrontation Clause and route a fraudulent $4,413.00 cash judgment straight into the associate's pocket.

### SECTION XIII: RECENT MEDIA CORROBORATION OF WASHINGTON COUNTY SHERIFF SYSTEMIC SCANDAL

The ongoing structural corruption and bad faith within the executing agency is further corroborated by local public reporting. Recent investigative news articles published in the regional Washington County press have exposed widespread systemic scandals, internal investigations, and official misconduct within the Washington County Sheriff's Office. These public media tracks document a documented custom, pattern, and practice of unconstitutional enforcement tactics and administrative non-compliance across the department, disproving any claim that the Defendant's

treatment was an isolated error, confirming municipal liability under federal guidelines, and necessitating immediate federal intervention to halt all localized state authority.

**SECTION XIV: THE IMMEDIATE 24-HOUR TIME-SENSITIVE COLLISION POINT**

The Respondents have scheduled a localized probation reporting mandate for tomorrow morning, July 14, 2026, at 9:00 AM at the Washington County Sheriff's station, immediately followed by a forced felony arraignment in Riley County District Court at 1:00 PM under Case No. RL-2026-CR-000258. Because the entire multi-county tracking track is a bad-faith retaliatory conspiracy designed to economically starve a 100% disabled veteran and shield local officials from civil liability, an immediate federal intervention is required.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court issue an immediate Emergency Order:

1. Overturning and vacating the void Leavenworth County conviction under Case No. LV-2025-CR-000337.

2. Halting tomorrow morning's July 14, 2026, 9:00 AM probation reporting mandate at the Washington County Sheriff's station.

3. Freezing tomorrow afternoon's July 14, 2026, 1:00 PM Riley County felony arraignment under Case No. RL-2026-CR-000258.

4. Staying the upcoming July 21, 2026 Washington County status conference under Case No. WS-2026-CR-000002.

Dated: July 13, 2026

**Brian LaCamera, Petitioner Pro Se**
606 S. Main St., Linn, KS 66953